FRANK A. ZAYAS,                 :
     Plaintiff,             :
                              :
v.                            :       Civil No. 3:16CV485 (DJS)
                              :
NANCY A. BERRYHILL,[1],     :
ACTING COMMISSIONER OF    :
SOCIAL SECURITY          :
     Defendant.          :

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This is an administrative appeal following the denial of an application filed by the plaintiff, Frank A. Zayas ("Zayas"), for disability insurance benefits ("DIB"). It is brought pursuant to 42 U.S.C. § 405(g).[2]

Zayas now moves for an order reversing the decision of the Commissioner of the Social Security Administration ("Commissioner"). In the alternative, Zayas seeks an order remanding his case for a rehearing. The Commissioner, in turn, has moved for an order affirming her decision.

---

[1]Nancy A. Berryhill is now the Acting Commissioner of Social Security and is therefore substituted for Carolyn W. Colvin as the defendant pursuant to Fed. R. Civ. P. 25(d).

[2]Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. § 405(b)(1). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). *See* 20 C.F.R. §§ 404.929. Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §404.967. If the Appeals Council declines review or affirms the ALJ opinion, the claimant may appeal to the United States district court. Section 205 (g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405 (g).

The issues presented are whether the ALJ erred: (1) in assessing the medical evidence in the record; (2) in determining Zayas's residual functional capacity ("RFC"); and (3) in concluding, on the basis of testimony from a vocational expert, that Zayas was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. For the following reasons, Zayas's motion for an order reversing or remanding the Commissioner's decision is denied, and the Commissioner's motion for an order affirming that decision is granted.

FACTS [3]

On or about May 25, 2010, Zayas filed an application for disability benefits alleging a disability onset date of December 18, 2008, and continuing through December 31, 2013, the last insured date.[4] On August 5, 2010, a disability adjudicator in the Social Security Administration denied his initial request for DIB benefits and thereafter denied his request for reconsideration.

On February 13, 2012, Zayas appeared with counsel for a hearing before an ALJ and the ALJ subsequently issued a decision denying benefits. On March 28, 2013, the Appeals Council vacated the ALJ's decision and remanded the case back to the ALJ for the following reason:

> The Administrative Law Judge found the claimant had the
> residual functional capacity to perform light work except he
> was limited to occasional bending, stooping, twisting, squatting,
> kneeling, crawling, climbing, and balancing, was able to

---

[3]The facts are derived from the joint stipulation of facts filed by the parties, as well as from medical records, the transcript of the administrative hearing, and the decision of the ALJ.

[4]In order to be entitled to disability benefits, a claimant must "have enough social security earnings to be insured for disability, as described in § 404.130." 20 C.F.R. § 404.315 (a)(1). In this instance Zayas had sufficient social security earnings to be insured through December 31, 2013.

> interact on an occasional basis with the public, coworkers and
> supervisors, and was able to perform simple and routine tasks
> with occasional supervision (Finding No. 5). However, there is
> no vocational evidence in the record regarding the extent to
> which the claimant's limitations erode the occupational base
> for light work.

(Doc. # 13-5, at 51, p. 666).[5]

A second hearing was held by the ALJ on April 16, 2014. On September 25, 2014, the ALJ issued a decision denying benefits. On February 22, 2016, the Appeals Council denied Zayas's request for review of that decision thereby making the ALJ's decision the final decision of the Commissoner. This appeal followed.

Zayas, who was born on June 3, 1973, has a high school education. His past relevant work was as a residential care aide, a warehouse worker, and a mixing machine operator. His most recent job, which ended in late 2008, was "taking care of [the] mentally challenged." (Doc. # 13-4, at 335, p. 594). He did not leave that job because of any mental or physical health issues, but because "they had me in - - in an investigation, in the job, and they (INAUDIBLE) to fire me." (*Id.*).

Medical Evidence

A. Physical Impairment

Zayas presented to his primary care physician, Helar Campos, M.D. ("Campos"), on March 10, 2009, complaining of lower back pain with numbness and foot pain. He reported that the pain was worse when he sat for long hours. Upon examination, Campos noted positive

_____

[5]The designation "at 51" refers to the page number (indicated at the top of the page) assigned by the Court's electronic filing system within the cited document (in this instance, document 13-5). The designation "p. 666" refers to the page number (indicated at the bottom of the page) assigned within the administrative record filed by the Commissioner.

straight-leg raising on the right side, normal gait, and normal muscle power. Campos saw Zayas again three days later and prescribed Percocet for his back pain.

In April 2009 Campos saw Zayas on a follow-up visit and recommended that he "start doing diet and exercise to see if we can manage" his morbid obesity. (Doc. # 13-9, at 16, p. 1009). Campos also prescribed a cane in response to Zayas's complaints of difficulty walking. On May 27, 2009, Zayas complained to Campos of knee pain and was noted to have an abnormal gait and range of motion. In June 2009 Campos noted that Zayas's back pain was stable and that his gait was within normal limits with no instability.

A June 2009 MRI of Zayas's lumbar spine indicated "[m]ild multilevel lumbar facet[6] DJD [degenerative joint disease], moderate at L5-S1." (*Id.* at 138, p. 1131). Campos reviewed the MRI report and opined that Zayas's back pain was due to his obesity. He referred Zayas to a nutritionist and a physical therapist and noted that the long-term plan was for Zayas to lose weight, strengthen his muscles, and get off pain medication. Zayas went for physical therapy for his back pain in June and July 2009. On September 22, 2009, he met with a nutritionist. He reported to the nutritionist that he was able to exercise on an elliptical trainer for thirty minutes a day and was lifting weights five days a week.

On June 3, 2010, Dr. Daniel Glenney ("Glenney"), an orthopedist, examined Zayas's right knee and diagnosed bursitis. He found mild tenderness medially and noted that x-rays of the knee showed minor spurring but were otherwise normal. Glenney prescribed medication for pain. Zayas continued to complain of knee pain, and on July 9, 2010, Glenney administered an

---

[6]"The facet joints, which are a pair of small joints at each level along the back of the spine, are designed to provide support, stability, and flexibility to the spine." https://www.spine-health.com/glossary/hypertrophic-facet-disease.

injection to Zayas's knee.

In connection with Zayas's application for DIB benefits, Ronald S. Jolda, D.O. ("Jolda") conducted a consultative examination of Zayas on July 26, 2010. At that time, Zayas reported that he suffered from the following conditions: diabetes, anxiety, arthritis in his back and left knee, back pain, bipolar disorder, depression, and sleep apnea. Zayas told Jolda that his left knee bothered him all of the time and snapped when he walked. He was vague as to how far he could walk and stated that he was not receiving treatment for his knee. Upon examination, Zayas walked slowly and leaned heavily on his cane. He refused to squat, put his full weight on each leg, or stand on his toes and heels because he said it would hurt too much. Jolda's report indicates that Zayas made a "half hearted" effort during range of motion testing and demonstrated limited range of motion in his lumbar spine. (Doc. # 13-10, at 5, p. 1252). Zayas screamed out in pain upon light palpation to the lumbar area, and, according to Jolda, Zayas's pain was "out of proportion to [the doctor's] findings." (*Id.*). Jolda found full range of motion and full strength in Zayas's arms and legs with the exception of some limitation in his left knee joint. Jolda concluded that Zayas "may have some mild arthritis of the left knee," and that Zayas's "pain complaint and presentation is way out of line." (*Id.* at 6, p. 1253).

A September 2010 MRI of Zayas's lumbar spine found degenerative disc disease and facet joint degenerative joint disease. The Neurosurgery Progress Note regarding that MRI, which was authored by Hilary C. Onyiuke, M.D. ("Onyiuke"), indicated that the MRI of Zayas's lumbar spine was "essentially normal" and that Zayas did not require surgical intervention at that point. Onyiuke opined that Zayas's weight was "the cause of his low back pain." (*Id.* at 34, p. 1281).

On July 27, 2012, after he had run out of pain medication, Zayas went to the Backus Hospital Emergency Department complaining of non-radiating lower back pain and knee pain. Upon examination, his straight leg raising was normal, although he exhibited some tenderness and decreased range of motion. Zayas was diagnosed with chronic pain and referred to his primary care physician.

On January 28, 2014, Megan Stone, A.P.R.N. ("Stone"), examined Zayas. She found muscle spasms and moderately reduced range of motion in his lumbar spine. In a Medical Source Statement (Physical) prepared on that same date, Stone determined the following concerning Zayas's ability to do work-related activities:

| | |
|---|---|
| Lift and Carry: | Occasionally up to 10 lbs., Never over 10 lbs. |
| Sit: | One hour at a time, seven hours in an 8 hour workday |
| Stand: | Thirty minutes at a time, two hours in an 8 hour workday |
| Walk: | Thirty minutes at a time, two hours in an 8 hour workday |
| Reach: | Occasionally |
| Push/Pull: | Occasionally |
| Handle: | Occasionally |
| Finger: | Occasionally |
| Feel: | Occasionally |
| Foot controls: | Never |

(Doc. # 13-11, at 221-24, pp. 1726-29).

B. Mental Impairment

On April 3, 2009, Zayas reported to Campos that he was "having trouble with his depression." (Doc. # 13-9, at 15, p. 1008). Zayas saw Campos again on April 6, 2009, and stated that he was "extremely depressed" and had a gun (*Id.* at 18, p. 1011). Campos referred Zayas to the emergency room and he was admitted to the psychiatric service. A few days after Zayas visited the emergency room, Campos noted that hospital staff had prescribed Seroquel, Klonopin,

and Celexa for his depression. By May 2009 Campos noted that Zayas's depression was well-controlled with these new medications. On July 29, 2009, Campos noted that with respect to his depression, Zayas was "seeing a psychiatrist and doing well." (Doc. # 13-10, at 96, p. 1343).

On May 22, 2009, Zayas began mental health treatment at United Community and Family Services ("UCFS"). With the exception of a six-month period during which he was incarcerated, Zayas was engaged in regular mental health therapy for over six years at UCFS.

In September 2012 Zayas was referred by his UCFS therapist, Julia Israelski, LCSW ("Israelski"), to the Backus Hospital partial hospital program due to increasing depression, anxiety, and suicidal thoughts. Zayas began attending the partial hospital program on October 1, 2012, and his attendance at the program was noted to be "quite sporadic." (*Id.* at 230, p. 1477). While in the program, Zayas learned new coping strategies and noted that his chronic pain decreased as he became more active. During this time, Zayas reported participating in activities such as riding his motorcycle, going out to dinner, and driving his family to Pennsylvania. Zayas was discharged from the partial hospital program back to UCFS on November 12, 2012. At the time of his discharge, Zayas "stated that he was not experiencing any psychotic symptoms." (*Id.* at 231, p. 1478). The prognosis for Zayas noted in the partial hospital program Discharge Summary was "good." (*Id.* at 232, p. 1479).

On February 19, 2013, Israelski referred Zayas back to the Backus Hospital emergency department due to increased depression, auditory hallucinations, and suicidal ideation. He was admitted to the hospital on a voluntary basis for three days and his medication was adjusted. The Discharge Summary relating to this admission states that at the time of his discharge Zayas was "demonstrating adequate insight and judgment, brightening of his affect and there is no suicidal

or self-destructive ideation." (Doc. # 13-11, at 102, p. 1607).

In a Medical Report for Incapacity dated November 12, 2013, Israelski opined that Zayas was not "capable of simple, competitive employment at this time" due to his "depression [with] psychotic features, apathy, low self esteem, low frustration tolerance, easily overwhelmed, anxiety, panic attacks, racing thoughts, isolates when stressed, fleeting suicidal/homicidal thoughts, hallucinations including history of command hallucinations to harm self." (*Id.* at 184, p. 1689).

In December 2013 Israelski and Zayas's UCFS psychiatrist, Martin Maloney, D.O., prepared a Medical Source Statement (Mental) in which they opined that Zayas had mild limitations in his ability to understand, remember, carry out simple instructions, and make simple work-related decisions. They further opined that Zayas had moderate limitations in interacting appropriately with co-workers and the public, and in responding to changes in a routine work setting. They identified the following factors that supported their assessment:

> Frank has a low frustration tolerance and is easily agitated by others. He has difficulty trusting others intentions and at times has reported fleeting homicidal thoughts. Frank is easily overwhelmed and frustrated by change in environment or routine. Frank reports frequent auditory hallucinations which impair focus and contribute to isolation and avoidance. His depression also leads to apathy, low self esteem and suicidal thoughts.

(*Id.* at 193, p. 1698).

Hearing Testimony

At the April 16, 2014 hearing before the ALJ, Zayas testified as follows: He is unable to work because of his diabetes, high blood pressure, arthritis, low tolerance for people, panic

attacks, and anxiety attacks. He has back pain on a daily basis, twenty-four hours a day. He can only sit for twenty to twenty-five minutes at a time. He uses a cane, but is unable to walk very far. His diabetes is out of control, which makes him tired, affects his vision, and affects the nerves in his legs and arms. On a daily basis he stays in his room, isolated from everyone, looking at the walls and listening to a lot of voices and hallucinations. The voices command him to "do things, bad things, kill myself or harm somebody else." (Doc. # 13-4, at 299, p. 558).

Zayas is married and has three children whose ages at the time of the hearing were fourteen, eight, and one. He testified that his wife works full-time and he relies on his brother-in-law to take care of the baby. A nurse comes to Zayas's house once a week to check his vital signs and blood, help him organize his medications, check his feet, and ask him routine questions. He is able to independently bathe. Zayas also testified that he is unable to do any cleaning, laundry, or shopping and can only cook prepared meals in the microwave oven. Zayas's weight at the time of the hearing was 343 pounds.

A vocational expert, Dennis J. King, testified at the hearing via telephone. The vocational expert testified that Zayas was unable to perform any of his past jobs. The ALJ posed the following hypothetical to the vocational expert:

> assume an individual of the claimant's age, education, past relevant work experience . . . who is limited to performing the sedentary exertional level and has the further restrictions of the need for being limited to simple, routine, repetitive work; secondly being limited to only occasional interaction with the public, coworkers, supervisors; and thirdly, being limited to only occasional bending, stooping, twisting, squatting, kneeling, crawling, climbing and balancing.

(Doc. # 13-4, at 308, p. 567). In response to the ALJ's hypothetical, the vocational expert

testified that such an individual could work as a surveillance system monitor, as to which there were 340 jobs available in Connecticut and 63,800 nationally, or a telemarketer, as to which there were 2,740 jobs available in Connecticut and 312,200 nationally.

On cross-examination, the vocational expert clarified that the position of telemarketer would be ruled out if the interaction with the public restriction included telephone interaction as well as face-to-face interaction. The vocational expert also testified that the job of surveillance system monitor would be ruled out if the individual was off-task more than ten percent of the time.

The ALJ's Decision

In his decision, the ALJ found that Zayas had not engaged in substantial gainful activity since the alleged onset date (December 18, 2008) and had the following severe impairments: degenerative disc disease of the lumbar spine; arthritis of the knees bilaterally; obesity; diabetes mellitus; sleep apnea; depression with psychotic features; and anxiety and panic disorder. He also found that Zayas had the residual functional capacity to perform sedentary work[7] with occasional bending, stooping, twisting, squatting, kneeling, climbing, and balancing. The ALJ also found that Zayas would be further limited to simple, routine, repetitive work, and occasional interaction with supervisors, co-workers, and the general public. The ALJ concluded that, through the date he was last insured (December 31, 2013), Zayas was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.

---

[7]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567 (a).

Consequently, the ALJ concluded that Zayas was not disabled for purposes of the Social Security Act.

STANDARD

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205 (g) of the Social Security Act, 42 U.S.C. § 405 (g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive . . . ." 42 U.S.C. § 405 (g). Accordingly, the district court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Wagner v. Secretary of Health and Human Services*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching his conclusion and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Therefore, absent legal error, this Court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Further, if the Commissioner's decision is supported by substantial evidence and not affected by legal error, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

The Second Circuit has defined "substantial evidence" as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence must be "more than a mere scintilla or a touch of proof

here and there in the record." *Williams*, 859 F.2d at 258.

DISCUSSION

The Social Security Act establishes that benefits are payable to individuals who have a

disability. 42 U.S.C. § 423 (a)(1). "The term 'disability' means . . . [an] inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423 (d)(1). In order to

determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ

must follow a five-step evaluation process as promulgated by the Commissioner.[8]

In order to be considered disabled, an individual's impairment must be "of such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the

national economy." 42 U.S.C. § 423 (d)(2)(A). "'[W]ork which exists in the national economy'

means work which exists in significant numbers either in the region where such individual lives

---

[8]The five steps are as follows: (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work; and (5) if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. 20 C.F.R. § 416.920 (a)(4)(i)-(v).

or in several regions of the country." *Id.*[9]

On appeal Zayas has raised issues concerning the ALJ's assessment of the medical evidence in the record, his determination of Zayas's RFC, and his conclusion that Zayas was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. Each of these issues will be discussed below.

I. Assessment Of The Medical Evidence In The Record

Zayas argues that the ALJ did not properly assess the medical evidence in the record. Specifically, he contends that "the ALJ erred in rejecting the medical source statements of treating physicians Julia Israelsk[i] and Megan Stone." (Doc. # 17, at 4). The Commissioner responds that the ALJ properly assessed all medical source information regarding Zayas's physical and mental impairments.

In presenting this argument Zayas invokes what is known as the "treating physician rule." "According to this rule, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527 (c)(2)). Zayas characterizes both Israelski and Stone as "treating physicians." In order for a medical opinion to qualify for the treating physician rule, however, the opinion must be provided by an "acceptable medical source." For purposes of the

---

[9]The determination of whether such work exists in the national economy is made without regard to: (1) "whether such work exists in the immediate area in which [the claimant] lives"; (2) "whether a specific job vacancy exists for [the claimant]"; or (3) "whether [the claimant] would be hired if he applied for work." 42 U.S.C. § 423 (d)(2)(A).

treating physician rule, an acceptable medical source is limited to physicians, psychologists, optometrists, podiatrists, and speech-language pathologists. *See* 20 C.F.R. § 404.1513 (a).[10] Because neither Israelski nor Stone was an acceptable medical source as defined by the governing regulation, the treating physician rule does not apply to their opinions.

The opinions of Israelski and Stone would be considered "[o]pinions from medical sources who are not acceptable medical sources." 20 C.F.R. § 404.1527 (f)(1). "Opinions from medical sources who are not acceptable medical sources . . . may reflect the source's judgment about some of the same issues addressed in medical opinions from acceptable medical sources. . . . [T]he evaluation of an opinion from a medical source who is not an acceptable medical source . . . depends on the particular facts in each case." *Id.*

With regard to Israelite, Zayas contends that although the ALJ indicated that he placed great weight on her opinion, the hypothetical question posed by the ALJ to the vocational expert was inconsistent with Israelite's opinion that Zayas was not capable of occasional interaction with the public. Zayas argues that "it is clear from the medical source statement of Ms. Israelski that the plaintiff is not capable of occasional interaction with the public." (Doc. # 17, at 6). The opinions as to which the ALJ stated he was giving significant weight were contained in a

---

[10]The Court notes that on January 18, 2017, the Social Security Administration promulgated final rules that significantly change the way the Commissioner considers medical opinion evidence. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulation, 20 C.F.R. § 404.1520c, applies only to claims filed with the Social Security Administration on or after March 27, 2017. Accordingly, because Zayas's claim was filed before this date, this court applied the regulations in effect prior to March 27, 2017.

Medical Source Statement completed in December 2013.[11] As reflected in the ALJ's decision, the Medical Source Statement opines that Zayas had a "moderate" restriction as to his ability to "[i]nteract appropriately with the public." (Doc. # 13-11, at 193, p. 1698). For purposes of the Medical Source Statement, "moderate" is defined as follows: "[t]here is more than a slight limitation in this area but the individual is still able to function satisfactorily." (*Id.* at 192, p. 1697). The hypothetical question posed by the ALJ to the vocational expert assumed an individual who is "limited to only occasional interaction with the public, coworkers, [and] supervisors." (Doc. # 13-4, at 308, p. 567). The Court finds no inconsistency between the opinion that Zayas had a moderate restriction on his ability to interact appropriately with the public and the limitation specified by the ALJ in his hypothetical question to the vocational expert.

Zayas argues further that the ALJ's analysis of his condition failed to factor the physical limitations identified by Stone in her January 2014 Medical Source Statement, i.e., that he "could only occasionally lift 10 pounds . . . [and] never climb, balance, stoop, kneel, crouch or crawl." (Doc. # 17, at 6). According to Zayas, "[t]he work identified by the vocational expert necessarily involved" the physical activities ruled out in Stone's Medical Source Statement. (*Id.*). The two jobs identified by the vocational expert were surveillance system monitor and telemarketer. The Court notes in the first instance that the plaintiff has not offered anything other than supposition to demonstrate that these jobs "necessarily involve" the physical activities ruled out in Stone's statement.

The ALJ stated that he gave "some weight" to the opinions expressed by Stone in her

---

[11]The Medical Source Statement was signed by both Israelite and Zayas's psychiatrist, Dr. Maloney.

Medical Source Statement, finding the "sitting and lifting requirement to be consistent with the findings contained in this decision." (Doc. # 13-3, at 25, p. 24). The ALJ also found, however, that the "standing and walking" limitations indicated in that Statement were "too restrictive." (*Id.*). The ALJ noted that those limitations were based on Zayas's own report and gave only "partial weight to this opinion as it relies heavily on the claimant's own subjective complaints." (*Id.*).

"Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." *Matta v. Asrtrue*, 508 F. App'x 53, 56 (2d Cir. 2013). The ALJ's findings reflect the totality of the medical evidence in the record, which includes not only evidence from Stone, but also evidence from physicians who had treated or examined Zayas, MRIs of his lumbar spine, and opinions of physicians based on those MRIs. The Court finds no error in the ALJ's assessment of Stone's opinions.

The court concludes that the ALJ's assessment of the medical evidence in the record reflects the correct legal principles and is supported by substantial evidence. Consequently, Zayas's motion to reverse on the ground that the ALJ erred in his assessment of the medical evidence in the record is denied and the Commissioner's motion to affirm on that ground is granted.

II. RFC Determination Of Sedentary Work Capacity

Zayas argues that "the ALJ misstated the facts of the record as the basis for his finding that plaintiff had a sedentary work capacity." (Doc. # 17, at 7). The Commissioner responds that the ALJ's RFC finding is supported by substantial evidence in the record.

According to Zayas, the ALJ "simply misread the Activities of Daily Living form filled out by the plaintiff" when the ALJ stated in his decision that Zayas reported swimming, lifting weights, exercising, and riding his motorcycle. (*Id.*). In an Activities of Daily Living form dated September 28, 2010, Zayas indicated that there were certain activities, such as riding a motorcycle, that he had enjoyed prior to the onset of his alleged disability in December 2008 but was now unable to do at all. At the April 16, 2014 hearing, Zayas testified that his activities consisted mainly of "stay[ing] in my room. It's a safe place. That's where I feel comfortable. And this [has] . . . been a problem already for almost five years." (Doc. # 13-4, at 301, p. 560). In his decision, the ALJ referred to "numerous inconsistencies" in Zayas's reporting. (Doc. # 13-3, at 26, p. 25). Although Zayas testified that for almost five years he mainly stayed in his room all day, there was contradictory medical evidence in the record. A Backus Hospital record dated November 12, 2012 includes the following entry: "The patient began riding his motorcycle to the Partial Hospital Program on many days." (Doc. # 13-10, at 231, p. 1478). Another Backus Hospital record, dated September 22, 2009, stated that Zayas "started going to the gym 3 wks ago and since then has lost about 15 lb. He is able to exercise on elliptical trainer for 30 min/day and do upper body wt lifting 5 days/wk." (Doc. # 13-9, at 154, p. 1147). A third Backus Hospital record, dated October 8, 2012, states that Zayas "was swimming 4-5 times per week until recently with the cooler weather and found that to be helpful with his weight and arthritis." (Doc. # 13-10, at 256, p. 1503). The Court finds that the ALJ's reference to numerous inconsistencies in Zayas's reporting is supported by substantial evidence in the record.

Zayas maintains that the ALJ mischaracterized his mental health treatment "by finding Plaintiff's mental health had improved and that hallucinations and self-injurious behavior

increases during times of stress." (Doc. # 17, at 9). Zayas cites to a specific page in the ALJ's decision where these contested findings appear, i.e., page 23 of the administrative record filed by the Commissioner. On that particular page of his decision, the ALJ refers to improvement in Zayas's mental health during periods when he was hospitalized or participating in a partial hospitalization program. Each of those references cites to medical record evidence that reflects improvement in Zayas's mental health during periods when he was hospitalized or participating in a partial hospitalization program.

With regard to Zayas's claim that the ALJ mischaracterized his mental health treatment by finding that his hallucinations and self-injurious behavior increased during times of stress, the ALJ's decision includes the statement that "[t]he claimant has reported increased auditory hallucinations at times of increased stress." (Doc. # 13-3, at 24, p. 23). A Backus Hospital record, dated September 26, 2012, specifically states that Zayas "reports he hears voices twice a week, command in nature and especially when he is stressed." (Doc. # 13-10, at 243, p. 1490).[12] There is no reference whatsoever to self-injurious behavior on the page of the ALJ's decision cited by Zayas. At a later point in his decision the ALJ indicates that Zayas "testified to self-injurious behaviors, but has denied the same to his treating clinicians." (Doc. # 13-3, at 27, p. 26). That statement is followed by a citation to an exhibit containing office treatment records during the period from February to April 2014. Those records consistently indicate no self-injurious behaviors by Zayas. The court finds no merit to the claim that the ALJ mischaracterized Zayas's mental health treatment.

---

[12]The ALJ's statement about auditory hallucinations cites to Exhibits 20F and 22F. The correct citation to the Backus Hospital record quoted above is Exhibit 23F.

Zayas also contends that the ALJ's findings "completely contradict the plaintiff's testimony" regarding his pain and limitations. (Doc. # 17, at 7). In essence, Zayas challenges the ALJ's assessment of his credibility. The ALJ found that while Zayas's impairments could reasonably be expected to cause the symptoms he alleged, his statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely credible. The ALJ was "not persuaded by the claimant's testimony, as it contained multiple inconsistencies and implausible statements." (Doc. # 13-3, at 26, p. 25).

The ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The ALJ's "finding that the witness is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988). The "ALJ's credibility determination is generally entitled to deference on appeal." *Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013).

Some of the inconsistencies in Zayas's reporting, which was noted by the ALJ, were discussed above. The ALJ also noted that in November 2013 Zayas reported attending church and in April 2014 he cut his arm while washing dishes. Both of these activities are inconsistent with Zayas's testimony regarding the extent of his limitations. The ALJ's discussion of Zayas's credibility as to his pain also referred to Dr. Jolda's report that Zayas's pain complaint and presentation were "'way out of line.'" (Doc. # 13-3, at 27, p. 26) (quoting Doc. # 13-10, at 6, p. 1253). The court concludes that the ALJ properly determined credibility, and "weigh[ed] the credibility of the claimant's testimony in light of the other evidence of record." *Genier*, 606 F.3d

at 49.

Zayas argues further that the ALJ incorrectly found that he "'rarely went to therapy'" and "had poor attendance at the partial hospitalization program." (Doc. # 17, at 8). Although the phrase "rarely went to therapy" is presented in the plaintiff's memorandum as a quote from the ALJ's decision, that phrase does not appear in the ALJ's decision. What the ALJ said in his decision, in the context of Zayas's participation in a partial hospitalization program from September to November 2012 , was that his attendance "was quite sporadic." (Doc. # 13-3, at 24, p. 23). That exact quote appears in the Backus Hospital Discharge Summary pertaining to that participation. (Doc. # 13-10, at 230, p. 1477). With regard to a prior admission to the Backus Hospital partial hospitalization program in 2009, the ALJ stated that Zayas "had poor attendance." (Doc. # 13-3, at 24, p. 23). The Discharge Summary regarding that admission states the following: "The patient attended regularly his first five days. After that, his attendance became very poor." (Doc. # 13-9, at 128, p. 1121). There is no merit to these claims of error.

Zayas points to two other statements in the ALJ's decision that, according to him, constitute erroneous findings. He claims that the ALJ "incorrectly found that Plaintiff was working in April 2009." (Doc. # 17, at 10). The ALJ's decision includes the following statements: "Notably, the claimant told Dr. Campos in April 2009 that he had increased stress at work, as people were trying to get him fired. It appears that the claimant was working after his alleged onset date of December 2008." (Doc. # 13-3, at 22, p. 21). The ALJ's comments reflect the following notation made by Dr. Campos following an office visit by Zayas on April 6, 2009: "Patient . . believes co-workers and employees are trying to get him fired and lose all his benefits . . . ." (Doc. # 13-9, at 18, p. 1011). Notwithstanding this comment, the ALJ found that Zayas

"did not engage in substantial gainful activity during the period from his alleged onset date of December 18, 2008 through his date last insured of December 31, 2013." (Doc. # 13-3, at 17, p. 16).

Zayas also claims that the ALJ mischaracterized his testimony regarding travel. At the April 2014 hearing, the ALJ asked Zayas the following question: "How about any trips or travel in the last year or so?" (Doc. # 13-4, at 290, p. 549). Zayas's answer was "[n]o." (*Id.*). The record reflects that Zayas reported to Backus Hospital that he "drove his family down to Pennsylvania" in November 2012. (Doc. # 13-11, at 43, p. 1548). In his decision, the ALJ made the following observation concerning Zayas's traveling: "He stated that he had not taken any trips or traveled since his alleged onset date; however, the record reflects that the claimant drove his family to Pennsylvania." (Doc. # 13-3, at 26, p. 25). The basis of the ALJ's observation is not clear, although the Court notes that in an Activities of Daily Living form he completed on June 17, 2010, Zayas answered the question, "How often do you go outside?" by stating, "I go only to my [medical] appointments." (Doc. # 13-8, at 31, p. 901).

"Procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected." *Audler v. Astrue*, 501 F. 3d 446, 448 (5th Cir. 2007) (internal quotation marks omitted). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). Even if one or both of the ALJ's statements concerning Zayas's work and travel were erroneous, the ALJ's findings concerning Zayas's credibility would still be supported by substantial evidence, e.g., other inconsistencies noted in the ALJ's decision and other record evidence such as Dr. Jolda's report.

The court concludes that the ALJ's finding that Zayas can perform sedentary work is supported by substantial evidence of record and, therefore, Zayas's motion to reverse on the ground that the ALJ erred in finding that he had an RFC for sedentary work is denied and the Commissioner's motion to affirm on that ground is granted.

III. Vocational Expert Testimony

Zayas next argues that the ALJ's conclusion that significant numbers of jobs exist in the national economy that he could perform was inconsistent with the testimony of the vocational expert. He argues further that the vocational expert failed to provide data to support his statement that the national economy had such jobs. The Commissioner responds that the ALJ properly relied upon the vocational expert's testimony to conclude that significant numbers of jobs exist in the national economy that Zayas can perform.

"At Step Five [of the evaluation process], the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform. An ALJ may make this determination . . . by adducing testimony of a vocational expert." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citation omitted). "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion and accurately reflect the limitations and capabilities of the claimant involved." *Id.* (internal quotation marks and citation omitted).

Zayas contends that the ALJ's conclusion regarding jobs that he could perform was inconsistent with the vocational expert's testimony that he would be unable to perform either of the two jobs identified by the expert, which were surveillance system monitor and telemarketer,

if he was unable to stay on task for 90% of the work time or if he could not sit for more than 30 minutes at a time and had any face-to-face interaction with others. Zayas asserts that these additional limitations should have been included in the hypothetical posed to the vocational expert. He claims that these limitations were consistent with A.P.R.N Stone's Medical Source Statement.

The ALJ's assignment of partial weight to the opinions expressed by Stone in her Medical Source Statement was discussed in a previous section of this ruling. The Court notes further that there is no mention in that Statement of Zayas's ability to stay on task. The plaintiff has not cited any evidence that supports the supposition that he would be unable to stay on task for 90% of the work time in the jobs identified by the vocational expert.

There is likewise no mention in Stone's Medical Source Statement of Zayas's ability to have face-to-face interaction with others. At the hearing, the questions posed by Zayas's counsel to the vocational expert regarding face-to-face contact concerned the job of telemarketer. The expert testified that a telemarketer deals with the public on the phone, "but it's not a face to face type of interaction." (Doc. # 13-4, at 310, p. 569).

Zayas's counsel also asked the vocational expert whether his opinion regarding jobs that were available to Zayas would be affected if Zayas were limited to sitting for 30 minutes at a time. The vocational expert answered "[n]o" and proceeded to explain, as to the job of surveillance system monitor, that the worker has the ability to sit, stand, or move around as needed. (*Id*. at 311-12, pp. 570-71). Additionally, Stone's Medical Source Statement, which according to Zayas is consistent with a 30 minute sitting limitation, states that Zayas could sit for one hour at a time without interruption. Zayas has failed to demonstrate that the ALJ's

conclusion regarding jobs available in the national economy that he could perform was inconsistent with the testimony of the vocational expert.

In discussing the vocational expert's testimony, the ALJ noted that the expert said Zayas would be able to perform the job of a telemarketer, as that job involved only telephone contact and not face-to-face interaction with the public. The ALJ went on to state that even if he were to eliminate the telemarketer job from consideration, "there remains significant jobs available in the national economy that the claimant could perform," i.e., the surveillance system monitor jobs. (Doc. # 13-3, at 28, p. 27). The expert testified that there were 340 surveillance system monitor jobs available in Connecticut and 63,800 nationally. Zayas contends that the vocational expert "provided no data as to his statement that the national economy had such jobs and his statement is a dubious one given the incredibly low numbers that the vocational expert came up with for that job in Connecticut." (Doc. # 17, at 12).

After the vocational expert testified about the specific jobs Zayas could perform, the ALJ asked the expert whether his testimony was consistent with the Department of Labor's *Dictionary of Occupational Titles* (DOT), as the ALJ was required to do by Social Security Ruling 00-4p."[13] The expert confirmed that his testimony was consistent with the DOT and he had, in fact, linked both the surveillance system monitor and telemarketer jobs to their DOT codes when he identified them as jobs Zayas could perform. "[A] vocational expert is not

---

[13]Social Security Ruling 00-4p "emphasizes that before relying on VE [vocational expert] . . . evidence to support a disability determination or decision, our adjudicator must . . . [i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs . . . and information in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO), published by the Department of Labor . . . ." SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000).

required to identify with specificity the figures or sources supporting his conclusion, at least where he identified the sources generally." *McIntyre*, 758 F.3d at 152; *see also Dugan v. Social Security Administration*, 501 F. App'x 24, 25 (2d Cir. 2012) (internal quotation marks omitted) (noting "the marked absence of any applicable regulation or decision of this Court requiring a vocational expert to identify with greater specificity the source of his figures or to provide supporting documentation").

An ALJ may credit the testimony of a vocational expert "given on the basis of the expert's professional experience and clinical judgment, and . . . not undermined by any evidence in the record." *McIntyre*, 758 F.3d at 152. Although Zayas's counsel cross-examined the vocational expert about the surveillance system monitor job, he did not question him about the number of such jobs available in the national economy or in Connecticut. The Court concludes that "the vocational expert was not required to articulate a more specific basis for his opinion, and the ALJ reasonably credited this testimony. . . ." *Id.* Zayas's motion to reverse on this ground is denied and the Commissioner's motion to affirm on this ground is granted.

CONCLUSION

For the reasons stated above, the plaintiff Zayas's motion to reverse the Commissioner's decision (**doc. # 16**) is **DENIED** and the Commissioner's motion to affirm the decision (**doc. # 19**) is **GRANTED**.

Judgment shall enter in favor of the defendant Commissioner.  The Clerk is directed to close the file.


SO ORDERED this     27th        day of September,  2017.


_____/s/ DJS_____
                        Dominic J. Squatrito
                        United States District Judge